394 So.2d 714 (1981)
Nelson Joseph ANDRUS, Plaintiff-Appellant,
v.
Dr. Joseph G. PATTON et al., Defendants-Appellees.
No. 8012.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1981.
*715 Kenneth W. Cole, Lafayette, for plaintiff-appellant.
Pugh & Boudreaux, Charles J. Boudreaux, Lafayette, for defendants-appellees.
Before CULPEPPER, GUIDRY and CUTRER, JJ.
GUIDRY, Judge.
This is a medical malpractice suit filed by the plaintiff, Nelson Joseph Andrus, against defendants, Drs. Joseph G. Patton, Glynn Granger, Seldon J. Deshotels and their professional liability insurer, St. Paul Fire and Marine Insurance Company. Defendant physicians are business associates who work out of the same office located in Opelousas, Louisiana. Plaintiff's suit was dismissed by the trial court on a peremptory exception of prescription. Plaintiff appeals that ruling.
The single issue for resolution by this court is whether or not the record supports the trial court's conclusion that the plaintiff's cause of action has prescribed. We determine that the record does not sustain the lower court's decision and reverse.
The facts as disclosed by the record, which consists merely of the pleadings and the plaintiff's deposition, are as follows:
On March 15, 1975, plaintiff while standing on the side of a highway, was struck by a piece of gravel hurled by a passing automobile. As a result of this injury, plaintiff suffered inflammation of the left leg. On April 1, 1975, plaintiff consulted defendant, Dr. Joseph G. Patton, regarding his leg injury. After examining the plaintiff, Dr. Patton recommended that he undergo a "vein stripping" operation. Dr. Patton performed the recommended procedure on April 17, 1975. Immediately after the operation, plaintiff experienced complications including fever, breathing difficulties, and spitting up of blood. Six days following the initial surgical procedure, defendant, Dr. Seldon J. Deshotels, informed plaintiff that he must undergo a "President Nixon operation" to correct the problems which occurred after the "vein stripping" procedure. On April 23, 1975, Drs. Deshotels and Granger performed a lower vena cava ligation, tying off the major vein to the plaintiff's heart. Plaintiff remained in the hospital until discharge on or about May 17, 1975. Plaintiff filed suit against defendant on April 14, 1978. The aforementioned dates are the only dates noted in the record with specificity.
According to the plaintiff's deposition he experienced continuous swelling of his left breast, enlargement of his right leg and pain in both his chest and legs after discharge from the hospital. Plaintiff states that he continued to see Drs. Patton and Deshotels for "a long, long time". Plaintiff continued to receive medical care from Dr. Patton until such time as Dr. Patton informed him that he could do nothing more *716 for him. Plaintiff testified that he then sought medical advice from a Dr. Mnayer, a cardiologist. According to the plaintiff, he first consulted Dr. Mnayer approximately twelve to fifteen months prior to the taking of his deposition on May 16, 1979, or in other words, some time between January 1978 and May 1978. It was during this time that plaintiff states he first suspected that the operations were performed unnecessarily and improperly. Plaintiff testified that Dr. Mnayer told him that the vena cava ligation procedure should not have been necessary following a "vein stripping" operation. Dr. Mnayer, recommended that plaintiff consult with Dr. Cedric Dauphin regarding his medical condition. At that time, plaintiff also experienced prostate problems and decreased libido. Dr. Dauphin examined plaintiff and conducted a series of tests to determine the proper course of treatment of plaintiff's condition. He then prescribed fluid pills and certain medication to relieve plaintiff's loss of libido. Plaintiff testified that he consulted numerous physicians concerning his medical condition at about the same time he consulted with Drs. Mnayer and Dauphin. According to plaintiff during this period of time he was examined and/or treated by Dr. Charles Fontenot, a Dr. Vidrine, a Dr. deBlanc, and a Dr. Lockett all of whom informed him that the second operation was unnecessary.
The applicable statute on prescription in medical malpractice actions is LSA-R.S. 9:5628 which provides in pertinent part:
"A. No action for damages for injury or death against any physician, chiropractor, dentist, or hospital duly licensed under the laws of this state, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission or neglect, or within one year from the date of discovery of the alleged act, omission or neglect; provided, however, that even as to claims filed within one year from the date of such discovery, in all events such claims must be filed at the latest within a period of three years from the date of the alleged act, omission or neglect."
Although the cited statute was adopted subsequent to the alleged acts of malpractice, the general rule is that statutes of prescription are remedial in nature and are applied retroactively. Lott v. Haley, 370 So.2d 521 (La.1979).
The issue of prescription relative to medical malpractice actions has been the subject of a number of recent Louisiana Supreme Court decisions. Most notable of these decisions are Young v. Clement, 367 So.2d 828 (La.1979) and Cordova v. Hartford Accident and Indemnity Company and Dr. A and Dr. B, 387 So.2d 574 (La.1980). In Young, supra, the Supreme Court stated, "Prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action as long as such ignorance is not willful and does not result from his neglect." Henson v. St. Paul Fire & Marine Insurance Co., 363 So.2d 711 (La.1978); Dean v. Hercules Incorporated, 328 So.2d 69 (La.1976); Orleans Parish School Board v. Pittman Construction Co., 261 La. 665, 260 So.2d 661 (La. 1972); Penn v. Inferno Manufacturing, 199 So.2d 210 (La.App.), writ den. 251 La. 27, 202 So.2d 649 (1967); Walter v. Caffall, 192 La. 447, 188 So. 137 (La.1939); Comment, The Scope of the Maxim Contra Non Valentem in Louisiana, 12 Tul.L.Rev. 244 (1938).
The import of the court's statement in Young, supra, was both clarified and emphasized in Cordova, supra. In the latter case, the plaintiff, Raymond Cordova, was admitted to the hospital on April 27, 1975 to undergo three relatively simple surgical procedures: a vasectomy, a hydrocelectomy, and a left inguinal hernioplasty. Ten days following the surgery, Cordova experienced swelling of the right testicle which his physician dismissed as an expected result of the initial surgery. Approximately six days later, Cordova contacted his doctor's office complaining of fever, pain, tenderness, and swelling of the right testicle. Plaintiff's condition was diagnosed as a right testicular *717 abscess which required the removal of plaintiff's right testicle. About three weeks later, plaintiff resumed normal sexual relations with his wife. For some time thereafter, plaintiff had no libido problems. Gradually, however, he began experiencing a decline in his sex drive. Over a period of months following the second surgery, plaintiff suffered from depression and began to notice that his left testicle was shrinking in size. Plaintiff returned to his doctor with these complaints and was treated for minimal prostatitis and loss of sexual drive. On June 22, 1976, approximately one year and two months after the initial surgery, plaintiff complained to the doctor of frank impotence and learned that his left testicle had almost completely atrophied. Cordova asserted that it was not until this time that he realized his problems resulted from malpractice. When questioned, Cordova admitted that within one year of the surgery his left testicle had shrunk to fifty percent of its normal size. The appellate court, 378 So.2d 1088 (La.App. 3rd Cir. 1980), concluded that by that time (March, 1976, more than one year prior to service of the lawsuit on March 21, 1977) the plaintiff knew or should have known sufficient facts to excite his attention and put him on inquiry that the operation performed by the defendant doctors may have been performed negligently. The Louisiana Supreme Court in reversing the appellate court stated:
"Plaintiff's failure to connect the gradual shrinkage of his left testicle and decline of interest in sex with an operation performed ten months previously was not the result of neglect or willful ignorance... The law does not impose upon a layman the obligation to self-diagnose a psychopathological condition which reproductive biologists themselves do not fully understand. Plaintiff had confidence in his physicians' skill and judgment."
The Cordova court further commented,
"... The mere apprehension by plaintiff that `something was wrong' is not sufficient to start prescription unless plaintiff knew or should have known by exercising reasonable diligence that there was a reasonable possibility that his problem condition, the loss of libido and/or impotence, may have been caused by acts of malpractice."
In comparing the factual circumstances of the case at bar with those in Cordova, it seems evident that the plaintiff herein cannot be held to have knowledge of his entitlement to bring a malpractice suit against the defendants until such time as he was informed nothing further could be done for him and he consulted with other medical practitioners who allegedly informed him that the second operation was unnecessary. It is noteworthy that the plaintiff in Cordova was an intelligent, knowledgeable, sophisticated person who had previous experience with physicians, hospitals, and surgical procedures. Furthermore, at the time of trial, Mr. Cordova was employed in a professional capacity as an administrative assistant to a United States Congressman. In the instant case, plaintiff testified that he quit school in the fifth grade. Prior to becoming disabled via a work-related injury, plaintiff was employed as a common laborer. Plaintiff Andrus had no prior experience with surgical procedures that would provide him with any special insight into the possible causes of his malady. In fact, plaintiff testified that following his initial surgery, he inquired of medical personnel as to why he was experiencing so many post-operative difficulties and they informed him his problems were caused by a throat infection. Plaintiff continued to consult the defendants regarding his condition for "a long, long time" and did not seek advice from other physicians until defendants told him they could do nothing more for him. In light of Cordova, supra, and Young, supra, this court cannot say that this plaintiff was guilty of neglect or willful ignorance in not determining sooner that he was entitled to bring a malpractice action. The plaintiff herein is neither well-educated nor knowledgeable in the procedures and techniques of modern medicine. He, too, had confidence in his physicians' skill and judgment. Invoking the standard set out in Cordova, this court cannot say that the plaintiff failed to exercise reasonable *718 diligence in ascertaining the cause of his continued problems nor that he possessed more than a "mere apprehension" that "something was wrong".[1]
Defendants submit that it is well-settled that when a claim is prescribed on the face of the petition, the burden is on the plaintiff to establish an interruption or suspension of the prescriptive period. Hunter v. Sisters of Charity, 236 So.2d 565 (La.App. 1st Cir. 1979, rehearing denied, 1970); Steel v. Aetna Life and Casualty, 304 So.2d 861 (La.App. 3rd Cir. 1974, rehearing denied, 1975); Marcel v. Hospital Corporation of the Sisters of Saint Joseph, et al., 322 So.2d 302 (La.App. 1st Cir. 1975, rehearing denied, 1975). Defendants urge that the plaintiff has failed to sustain this burden of proof. We acknowledge the general rule as stated by defendants, however, we determine, for the reasons stated herein, that plaintiff did meet his burden of proof. As previously noted, the record consists of only the pleadings and the plaintiff's deposition. Plaintiff stated in his petition that he only recently became aware of reasons to suspect that his medical treatment by the defendants was improper. When deposed, plaintiff indicated that he failed to make the causal connection between the treatment provided by the defendants and his subsequent physical ailments until such time as he consulted with other medical practitioners. Plaintiff's uncontroverted testimony reflects that he consulted with physicians other than the defendants some time between January 1978 and May 1978. As previously noted, plaintiff filed the instant suit on April 14, 1978 clearly "... within one year from the date of the discovery of the alleged act, omission, or neglect,..." as provided in the statute applicable to medical malpractice actions. Defendants offered no countervailing evidence to refute plaintiff's testimony, therefore we determine that the plaintiff sustained his burden of proof.
For the above and foregoing reasons, the judgment of the trial court granting defendants' exception of prescription is reversed and the case is remanded to the trial court for further proceedings. All costs of this appeal are assessed against the defendants-appellees. Assessment of costs in the trial court must await a final judgment there.
REVERSED AND REMANDED.
NOTES
[1] Our decision in the instant action should not be interpreted as holding that the running of prescription in medical malpractice actions is triggered only after plaintiff is informed by other medical practitioners that his physical ailment may have resulted from malpractice.