516 So.2d 1185 (1987)
Edwin H. POOLE, et ux., Appellants,
v.
PHYSICIANS & SURGEONS HOSPITAL et al., Appellees.
No. 19090-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1987.
Writs Denied February 5, 1988.
*1186 Watson, Murchison, Crews, Arthur and Corkern by William P. Crews, Jr. & Joseph B. Stamey, Natchitoches, for appellants.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, for appellees.
Before HALL, MARVIN and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
Plaintiffs filed this medical malpractice action on March 28, 1985 for brain injuries allegedly sustained by their child during birth on May 20, 1983. Defendants, the delivering physician and the hospital, filed an exception of one year prescription, which was sustained and the suit dismissed. Plaintiffs appealed that judgment. For the reasons hereinafter explained, we reverse.
Medical malpractice actions must be filed within one year of the date of the alleged act, omission or neglect. La.R.S. 9:5628. However, a prescriptive statute is subject to the discovery rule embodied in the doctrine of contra non valentem agree nulla currit prescriptio, when that doctrine is invoked to suspend the running of prescription during the period in which the cause of action was not known or reasonably knowable to the plaintiff.
The one year prescriptive period commences running on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. Thus, even if a malpractice victim is aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize that the condition *1187 may be related to the treatment. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574 (La.1980); Lott v. Haley, 370 So.2d 521 (La.1979); Young v. Clement, 367 So.2d 828 (La.1979).
At the hearing on the exception of prescription the plaintiff mother, Mrs. Poole, a 32 year old college graduate, testified that her baby Timothy was born on May 20, 1983, with Dr. Stamper as the attending physician. Mrs. Poole had a difficult labor and delivery. Because the baby began experiencing seizures soon after birth, it was transferred to a special unit at the Schumpert Hospital in Shreveport. Dr. Winterton, the pediatrician, advised Mrs. Poole that the baby had suffered birth trauma, was very sick and might not survive.
Mrs. Poole remained at P & S for five days and was discharged. Timothy stayed at Schumpert for some 13 days. Dr. Winterton informed Mrs. Poole that there had been considerable improvement in the child's condition but they would have to wait and see if there was permanent brain damage.
Upon the advice of a relative, when Timothy was three months old Mrs. Poole had a school board employee test the baby. His only apparent problem, according to the test, was a weakness in the neck. A physical therapist, Mrs. Miller, started giving the child physical therapy to improve the neck condition.
Timothy was not sitting up at six months, but Mrs. Poole was advised not to be concerned about this. However, the mother said she started becoming concerned about the child's condition some three months later. Upon taking Timothy to Dr. Winterton for his nine month checkup, Mrs. Poole asked about the possibility of cerebral palsy. Dr. Winterton replied this was a fair diagnosis but that they wouldn't know how significant it was until later. At the suggestion of Dr. Winterton, Mrs. Poole took Timothy to the LSU Medical Center in February 1984 for evaluation. Then, in May 1984 Dr. Winterton told Mrs. Poole that her son had moderate to severe cerebral palsy.
Mrs. Poole related, in a deposition which was received in evidence, that she had discussed the difficult birth with Dr. Stamper who told her it had been complicated by her "v" shaped pelvis. The physician allegedly drew diagrams showing exactly what the difficulty was.
Mrs. Poole testified that she first suspected possible malpractice in connection with the birth of Timothy several days before the birth of her second son (attended again by Dr. Stamper) in September 1984. A nurse friend had returned from a fetal monitoring workshop and advised Mrs. Poole that every prospective mother should have a fetal monitorwhich she did not have with Timothy. Also, during the birth of the second child Mrs. Poole asked the anesthetist about the administration of an epidural, which she had requested but not received with Timothy's birth and which the anesthetist indicated was available. Since the second child was delivered by a Caesarean section after a pre-natal period similar to her first child's, Mrs. Poole questioned why this procedure was not used with Timothy.
After an examination in November 1984, Dr. Winterton informed Mrs. Poole that Timothy was severely mentally retarded. This suit was filed in March 1985.
Mrs. Miller, a Natchitoches physical therapist, testified she first saw Timothy as a patient when he was three months old. He looked like a normal baby, but his head control was slightly diminished. She instructed Mrs. Poole on different positions and ways to stimulate the child with toys, voice and motion. Mrs. Miller began seeing Timothy on a regular basis. In November 1983 she wrote a letter to Dr. Winterton requesting that he discuss with Mrs. Poole the exact condition of her child. In response Mrs. Miller received a prescription for physical therapy. According to this witness, Mrs. Poole never questioned the therapist concerning whether Timothy's injuries were related to malpractice at birth until the November 1984 visit with Dr. Winterton.
Dr. Winterton testified that he had diagnosed Timothy as having encephalopathy *1188 secondary to anoxia in the perinatal period. He said the parents were aware of brain injury before the baby was discharged from Schumpert. On February 20, 1984 Dr. Winterton advised Mrs. Poole that Timothy had a handicap that appeared to be cerebral palsy but they would have to "wait and see" before determining the percentage of damage. He referred the mother to the Child Evaluation Center at the LSU Medical Center.
Dr. Winterton said he had a frank discussion with Mrs. Poole about probable permanent abnormalities that included moderate to severe mental retardation on November 9, 1984. He told her he believed a deprivation of oxygen occurring during the later stages of labor or delivery caused the birth trauma and brain damage.
In his reasons for ruling, the trial judge concluded that Mrs. Poole had enough information when she left the hospital to begin running of the one year prescriptive periodbecause of the baby's seizures, the diagnosis of Dr. Winterton, and the moving of the child to a special unit at Schumpert.
Plaintiff's argue that Mrs. Poole only acquired constructive knowledge of the possibility of medical malpractice during the birth of Timothy as a result of the information gleaned during the birthing process of the second child in September 1984.
The general rule is that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a malpractice action as long as such ignorance is not willful and does not result from his neglect. Andrus v. Patton, 394 So.2d 714, (La.App. 3rd Cir.1981); Henson v. St. Paul Fire & Marine Insurance Co., 363 So.2d 711 (La.1978); Dean v. Hercules, Inc., 328 So.2d 69 (La.1976).
This rule was clarified in Cordova, supra, where the plaintiff was admitted to the hospital to undergo three relative simple surgical procedures: a vasectomy, a hydrocelectomy, and a left inguinal hernioplasty. Ten days after the surgery the patient experienced swelling in the right testicle, which his physician dismissed as an expected result of the initial surgery. Six days later the patient contacted the doctor's office complaining of fever, pain, tenderness and swelling. The plaintiff's condition was diagnosed as an right testicular abscess which required removal of plaintiff's right testicle. Three weeks later plaintiff appeared to get better and resumed normal sexual relations with his wife. Gradually, however, he began experiencing a decline in his sex drive. Over a period of six months following the second surgery, plaintiff suffered from depression and began to notice that his left testicle was shrinking in size. Plaintiff returned to the same doctor with these complaints and was treated for minimal prostatitis and loss of sexual drive. Approximately one year later and two months after the initial surgery, plaintiff complained to the doctor of impotence and learned that his left testicle had almost completely atrophied. The patient asserted that it was not until this time that he realized his problem, which he had been dealing with for over a year, resulted from malpractice. The appellee court concluded that within one year the plaintiff knew or should have known sufficient facts to excite his attention and put him on inquiry that the operation performed by the doctors had been performed negligently. The supreme court reversed and stated:
"Plaintiff's failure to connect the gradual shrinking of his left testicle and decline of interest in sex with an operation performed ten months previously was not the result of neglect or willful ignorance. The law does not impose upon a layman the obligation to self-diagnose... Plaintiff had confidence in his physician's skill and judgment."
In Zeno v. Lincoln General Hospital, 376 So.2d 1284 (La.App. 2d Cir.1979), the patient suffered pain and discomfort after rectal surgery. This court held that prescription did not commence until the date within one year of the suit when another doctor told her that the previous operation caused the difficulty. Until that time she had no reason to believe that a tort had been committed and no way to recognize the causal connection between the operation and her discomfort. Mrs. Zeno never suspected her surgeon had done anything wrong because he told her she was experiencing *1189 normal tenderness from the surgery. The surgeon had declined to give Mrs. Zeno a prognosis during her visits.
In the Griffin case, supra, our state supreme court affirmed a trial court judgment overruling an exception of prescription in a medical malpractice case where the suit was filed in 1983 for a birth injury which occurred in 1964, commenting:
"Here, according to evidence at the hearing on the exception, the first point in time at which plaintiffs were reasonably alerted that they may have a cause of action and should seek to develop further information was when Mrs. Anselmo read the newspaper article about the Florida child's blindness resulting from the negligent administration of oxygen after her premature birth. Prior to this time, plaintiffs had no reason to relate the child's eye symptoms to any malpractice on the part of the doctors, especially since the doctors told them the symptoms were the normal result of necessary administration of oxygen in premature birth. The doctrine of contra non valentem therefore suspended the running of prescription during the time that the cause of action was not known or reasonably knowable to plaintiffs."
In contrast, see Percy v. State of Louisiana, through E.A. Conway Memorial Hospital, 478 So.2d 570 (La.App. 2d Cir. 1985), where we affirmed a judgment sustaining an exception of prescription, finding that "while plaintiff was still in the hospital in January 1983, she knew or believed that her child suffered injury (shoulder dyscotia) because of the apparent failure to deliver the child by caesarean section."
In this case there is no question but that soon after his birth in May 1983 Mrs. Poole knew that Timothy had been injured during birth. She was advised in February 1984 that the child had cerebral palsy. The critical question is whether, prior to one year before filing suit, Mrs. Poole should have realized that the child's brain injury was possibly related to negligent medical services rendered at birth. We answer this question in the negative.
Before September 1984 Mrs. Poole was apparently under the impression that her difficult labor while having Timothy was attributable to her "v" shaped pelvis. Dr. Winterton told Mrs. Poole in November 1984 that he believed a deprivation of oxygen during the later stages of labor or delivery caused the birth trauma. Mrs. Poole had such confidence in Dr. Stamper (as did the plaintiff in his doctor in the Cordova case) that she returned to him for the delivery of her second child.
No physician or health care worker suggested to Mrs. Poole prior to September 1984 that negligence might have been involved in the birth of Timothy.
Under the circumstances, we do not find that plaintiffs' failure, before September 1984, to connect their son's brain damage to possible malpractice during his delivery was the result of either willful ignorance or neglect. Therefore, they did not have either actual or constructive knowledge of their cause of action prior to one year before institution of suit. The trial judge erred in his ruling sustaining the exception of prescription.
In view of this holding, we find it unnecessary to consider plaintiffs' contention that La.R.S. 9:5628 is unconstitutional.
For the foregoing reasons, we reverse the trial court judgment; overrule the exception of prescription; and remand the case to the trial court for further proceedings consistent with this opinion. Cost of appeal is assessed to defendants-appellees.