756 So.2d 708 (2000)
Woodrow W. ADAMS, III, et al., Plaintiffs-Appellants,
v.
LOUISIANA MEDICAL MUTUAL INSURANCE CO., et al., Defendants-Appellees.
No. 33,030-CA.
Court of Appeal of Louisiana, Second Circuit.
April 7, 2000.
Writs Denied June 30, 2000.
*709 Hunter & Morton by John E. Morton, Alexandria, Counsel for Plaintiffs-Appellants Woodrow Adams & Alesha Adams.
Onebane, Bernard, Torian, Diaz, McNamara & Abell by William E. Bourgeois, Lafayette, Counsel for Defendant-Appellee Morehouse General Hospital.
Hudson, Potts & Bernstein by Gordon L. James & C. Bryan Racer, Monroe, Counsel for Defendants-Appellees Dr. Terry Tugwell, Jr. & Louisiana Medical Mutual Ins. Co.
Before BROWN, CARAWAY and DREW, JJ.
*710 DREW, J.
At issue is whether parents who knew a mistake was made at the birth of their child (seven weeks premature instead of three weeks premature as the doctor advised immediately prior to delivery) had sufficient knowledge for reasonable persons to suspect that malpractice caused the premature birth and resulting health problems of their daughter. Because the plaintiffs knew that their child was born prematurely with serious health problems, the defendants contend the parents had sufficient information to suspect that malpractice was involved. While acknowledging they knew the child's prematurity resulted in significant health problems, the parents maintained they had no way to know that the premature birth and ensuing problems were the result of malpractice until the different procedures at the birth of their second child and a diagnosis of cerebral palsy led them to suspect negligence at the first child's birth.
From the judgment dismissing their August 1995 medical malpractice action as prescribed, Woodrow Wilson Adams, III and Alesha Adams Keith appealed and contended that the trial court erred in finding that they had sufficient actual and constructive knowledge to commence the running of prescription after Courtney Adams' birth on October 3, 1992. Although recognizing that malpractice occurred, the trial court rejected the action as untimely. For the following reasons, the judgment sustaining the exceptions of prescription is reversed.

FACTUAL AND PROCEDURAL BACKGROUND
Born seven weeks early with numerous medical complications, Courtney Adams was delivered by Dr. Terrance Tugwell on October 3, 1992, at Morehouse General Hospital. Her mother, 16-year-old Alesha Adams, went to the hospital on October 2 because she was leaking fluid. A nitrazine test was performed to determine if the fluid was urine or amniotic fluid. The first test was negative for amniotic fluid. The second test was allegedly performed on fluid pooled where the mother had been seated. That leakage was stated to be amniotic fluid. Thereafter, Dr. Tugwell miscalculated the gestation age of the fetus and told the family the baby would be two to three weeks premature. The doctor attempted to induce labor with medication. By the next day the induction had failed and the child was delivered by cesarian section. Courtney had respiratory distress and other problems and was transferred soon after her birth to the Pediatric Intensive Care Unit (PICU) at St. Francis Medical Center in Monroe. Doctors at St. Francis informed the parents that the child was actually seven weeks premature. The parents were also told that the infant's problems resulted from the prematurity which had resulted in her low oxygen level.
The mother was discharged from Morehouse General on October 5, 1992. The infant Courtney remained hospitalized for some seven weeks. The final diagnosis on the St. Francis discharge summary was a premature (33 weeks gestational age) infant with severe hyaline membranes disease (lung); sepsis (infection); anemia; transient heart murmur; jaundice; seizures, unknown cause; transient neutropenia, increased alkaline phosphatase with decreased phosphorous; and umbilical hernia. The infant was discharged on phenobarbital and with instructions to see numerous doctors within the next month.
Approximately eight months after the child's birth, the mother sought to obtain social security disability benefits based upon her prematurity, seizures and slowed development. She attributed the child's problems to her premature birth. In connection with the social security claim, Alesha took Courtney at age 11 months to a Minden pediatrician, Dr. Quinones, whose report noted that
Mother thinks she is disabled because she had to take Physical Therapy because the left side of the baby is weaker. *711 CT Scan was normal but neurologist said it might show up on MRI. I still think she is weaker on left side. Also she had some seizures and I do not know if it will damage her brain because they still do not know the cause of the seizure.
Dr. Quinones's diagnosis was a premature infant with neonatal complications, heart murmur and apparently normal development for corrected age. The doctor recommended the MRI and follow-up by a neurologist.
According to the plaintiffs, they learned of the possibility of medical malpractice in two ways. At her deposition, the mother stated when her second child was born in December 1994, she again leaked fluid and the nitrazine test was again administered. The different nurses and doctor at the second birth explained that false positives could result from faulty testing and the mother became suspicious that the first test had been done wrong. (This testing information from the mother's second delivery was apparently not considered by the trial court who viewed it to be hearsay.) In July 1995, a doctor at LSUMC diagnosed Courtney with brain damage and cerebral palsy. The mother then suspected that Courtney's problems arose from an unnecessary labor induction. She consulted a lawyer and filed her claim on August 14, 1995.
In an amended petition filed in January 1999, the parents named Dr. Tugwell, his insurer and Morehouse General Hospital as defendants. Alleging that Courtney was born with numerous, serious disabling injuries, none of which were known to the plaintiffs at the time, the plaintiffs asserted a variety of negligent acts during labor and delivery including improper due date calculation, negligent induction of labor, and precipitation of a premature delivery. Among the injuries Courtney allegedly suffered were seizures, encephalopathy, permanent loss of motor and sensory function, permanent brain damage, respiratory distress syndrome and hyaline membrane disease. Plaintiffs asserted that they filed their action less than three years from the acts of medical malpractice and less than one year from when they obtained actual or constructive knowledge of the relationship between the tortious conduct and the damages sustained.
The defendants filed exceptions of prescription and asserted that plaintiffs filed their action more than one year from the date of the discovery of the alleged malpractice. La. R.S. 9:5628. The trial court sustained the exceptions and plaintiffs appealed.

PRESCRIPTION HEARING
Married April 18, 1992, when pregnant with Courtney, her first child, Alesha stated she had dropped out of the 10th grade in March 1992, obtained her GED in 1995, and thereafter completed courses at the Career Training Specialist to be a phlebotomist and a nurses assistant. Alesha testified that at the time of Courtney's birth she did not suspect negligence by Dr. Tugwell or any other health care provider. In December 1994, she gave birth to her second child, Mallory. Experiencing some of the same difficulties as in the first pregnancy, Alesha leaked fluid which she thought was amniotic fluid. She noticed differences in the nitrazine testing procedure in her two children's deliveries. After the trial court sustained the defense objections based upon relevancy and hearsay, plaintiffs offered a proffer consisting of the mother's testimony about the nitrazine testing procedure at Courtney's birth.
In May 1995, the mother and other relatives noticed that when Courtney ran, she had to draw her hands up to balance herself. Alesha testified that she inquired about the possibility of cerebral palsy to the child's neurologist who informed them there was no way the child had cerebral palsy, but the child did have epilepsy. In the process of performing a pupil appraisal on Courtney, the school board required that her parents obtain a second opinion about Courtney's condition. Alesha took *712 the child to LSU Medical Center in Shreveport in July 1995, where the doctor diagnosed cerebral palsy and brain damage due to lack of oxygen at birth. At that point the plaintiffs obtained legal counsel.
Alesha testified that between Courtney's 1992 birth and Mallory's 1994 birth no one informed her that someone or something caused Courtney's health problems. No health care provider informed her that Courtney's condition should or could have been prevented. Alesha attached no significance to the discrepancy in Courtney's being seven weeks premature instead of three weeks as originally advised by Dr. Tugwell. She and other relatives understood that her amniotic sac had ruptured and the child had to be delivered within 24 hours to avoid infection, regardless of the degree of prematurity. Prior to the 1995 diagnosis at LSUMC, no one informed Alesha of the actual nature of Courtney's problems. Alesha knew that her child had seizures which the neonatologist informed her were caused by Courtney's prematurity. However, Alesha did not know the prematurity was brought on by negligence. She thought the premature birth was just one of those things that happened.
On cross-examination, Alesha stated that Dr. Tugwell informed her that Courtney would be three weeks premature, but they later learned from personnel at St. Francis that Courtney was actually seven weeks premature. The St. Francis neonatologist informed her that Courtney's seizures and respiratory problems were the result of her prematurity. When Courtney was eight months old, Alesha filed for social security benefits and attributed the child's health problems to her prematurity.
Courtney's father testified that Dr. Tugwell had a strange and surprised look on his face while performing the C-section, that large amounts of water-like fluid gushed when the incision was made, and that the baby was kept away from them when she was delivered. Although surprised by the fluid, the father stated he had never seen a delivery before and did not suspect Dr. Tugwell had done anything wrong. He did not know what the fluid was and did not attach any significance to the discrepancy in the degree of Courtney's prematurity. After Courtney was transferred to St. Francis, they were told that the infant's problems were due to low oxygen levels due to the premature birth and learned that she was seven weeks premature.
The plaintiffs also introduced the deposition given by Cheryl Laing, the aunt of Woodrow "Chip" Adams, III, Courtney's father. An assistant district attorney in Rapides Parish, Laing stated the family had been concerned since Courtney's birth about her treatment, what was wrong and what was being done. Laing knew Courtney was premature because she had kept up with Courtney's due date which was sometime in November or December 1992. The family never discussed the reasons for prematurity, considering it something that just happened and thinking the infant's seizures and respiratory problems were typical in premature infants. When Courtney grew older and became more mobile, her slowed development and impaired motor skills became more noticeable.
The family's first inquiry to Laing about the possibility of something being wrong with medical treatment came in 1995, shortly after the July 1995 visit to the neurologist in Shreveport. That diagnosis was that the seizure medication Courtney had been on since birth was worthless and unnecessary and that the child had cerebral palsy. Laing referred the plaintiffs to their attorney. Laing stated that she learned only very recently that Dr. Tugwell caused the prematurity and that the prematurity might have been preventable.
Plaintiffs also submitted Dr. Terrance Tugwell's affidavit which had been presented to the medical review panel. According to his office records, Dr. Tugwell first saw Alesha concerning her pregnancy *713 on May 15, 1992. She had previously been seen at E.A. Conway Hospital and the Morehouse Parish Health Unit. The doctor also saw Alesha on June 11, July 2, July 6, August 3, September 3 and September 28. Alesha was admitted to Morehouse General by Dr. Tugwell on September 28 with vaginal bleeding and a possible marginal placental abruption. At that time the gestational age of the fetus was estimated to be 32 weeks. An ultrasound revealed a single fetus at 32½ weeks with no abnormalities and normal amniotic fluid. The ultrasound could not exclude a minimal, marginal abruption of the placenta. Alesha was discharged on September 30 with instructions for strict bed-rest. Dr. Tugwell saw her again in his office on October 1.
On October 2, Alesha went to Morehouse General and complained of pain in her lower abdomen and back along with leaking fluid. The nurse contacted the doctor who ordered a fetal heart monitor which showed no signs of fetal distress. The nitrazine test was negative. The mother then had a gush of clear fluid for which the nitrazine test was positive, so Dr. Tugwell admitted her to the hospital. Alesha was monitored by the nurses and Dr. Tugwell contacted the nurses to check her progress. Errors on the chart in three places stated that the infant's due date was October 16, 1992. Dr. Tugwell stated that he apparently used the incorrect information in arriving at an estimated gestational age of 38 weeks for the fetus and acknowledged that he should have discovered the due dates were incorrectly recorded. At 2:40 a.m., Dr. Tugwell discussed with the family the options and risks of expectant management versus delivery. Since she had spontaneous contractions and continuing loss of fluid, the doctor advised that Alesha was likely to continue to labor and deliver in a matter of time. He also informed the family of the concern for possible sepsis if delivery were postponed a long time, since she had been hospitalized with bleeding and possible marginal placental abruption.
When the decision to proceed with delivery was made, the doctor administered Pitocin to enhance labor. Although she had a good pattern of contractions, by 4:00 p.m. she had only minimally progressed. Based upon premature rupture of the membranes and failure of the labor, the decision was made for delivery by cesarean section. According to the doctor, the delivery had no complications. The child weighed 3 pounds 11.4 ounces and had an Apgar of 9/7. Describing the infant's condition as good, Dr. Tugwell stated that she had good color and respiratory effort but began respiratory distress at the nursery and was transported to intensive care at St. Francis.
In concluding his affidavit, Dr. Tugwell quoted his operative note dictated the day of delivery in which he noted a fair amount of nitrazine positive fluid in the vaginal vault and a diagnosis of premature rupture of the membranes. Relying on that surgical note, Dr. Tugwell presumed that he himself administered that nitrazine test, because "a nurse would not have made such a determination." Again acknowledging that he should have been aware of the error in the fetus's gestational age (actually 33 weeks as opposed to 38 weeks), Dr. Tugwell stated that his decision to proceed with the surgical delivery was probably correct based upon the later diagnosis of sepsis in the infant.

REASONS FOR JUDGMENT
Referring to the birth of this child as a total catastrophe, the trial court stated that the age of the fetus was miscalculated and the child was delivered by cesarian section seven weeks premature. Because the child had many complications, she was treated by a number of doctors from birth. The mother sought social security disability benefits for the child. Medical consultation determined that the child had cerebral palsy which was a direct result of the miscalculation of the child's gestation age. Further, the child had obvious complications *714 from birth and remained in PICU for a considerable period.
The trial court rejected the plaintiffs' argument that, because they were young, unsophisticated and poorly educated, prescription did not begin to run until a final diagnosis was made at LSUMC in July 1995, before the claim was filed in August 1995. The court applied the standard of the reasonable man and concluded that the plaintiffs should have immediately realized that a serious problem was present when the child was born. The father testified that when the doctor ruptured the sac, he observed Dr. Tugwell's expression and action. Dr. Tugwell informed the mother that the child was at least seven weeks early and was being transferred to St. Francis, but that it could not be guaranteed that the child would survive. While at St. Francis PICU, the parents were advised that the child had possible mild cerebral palsy and possible brain damage.
Based upon the foregoing, the trial court concluded that the parents had actual and constructive knowledge that the child was suffering from problems that resulted from the improper computation of the gestation age by the doctor. The trial court found that prescription began to run at the very latest from the child's treatment and release from the St. Francis PICU and not from the later 1995 diagnosis of cerebral palsy at LSUMC as claimed by the parents. Noting that obvious medical malpractice occurred with tragic results, the trial court stated that plaintiffs' claim had prescribed on its face. The trial court found that plaintiffs did not meet their burden of proving why the matter was not prescribed. Therefore, the trial court sustained the prescription exceptions in favor of all defendants and dismissed plaintiffs' action with prejudice.

DISCUSSION
La. R.S. 9:5628 states:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
The one year prescriptive period commences on the date of the alleged misconduct. When it appears on the face of the petition that prescription has accrued, the plaintiff must allege and prove facts indicating that the injury and its causal connection were not apparent or discoverable until within the year before the suit was filed. White v. Willis-Knighton Medical Center, 25,575 (La.App.2d Cir.2/23/94), 632 So.2d 1198, writ denied, 94-1024 (La.6/17/94), 638 So.2d 1098. In this matter, Courtney was born on October 3, 1993, and the claim was not filed until August of 1995. Therefore, the claim had prescribed on its face.
The statute requires that plaintiffs bring a medical malpractice action within one year from the date of the alleged malpractice or within one year from the date the plaintiff discovers or should have discovered the facts upon which his cause of action is based. Prescription does not run against plaintiffs who are ignorant of the facts upon which their cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. Prescription commences and continues *715 when plaintiffs obtain actual or constructive knowledge of facts indicating to reasonable persons that they are the victims of a tort. Constructive knowledge sufficient to commence the running of prescription requires more than a mere apprehension that something might be wrong. Even if malpractice victims are aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it is reasonable for the victims not to recognize that the condition may be related to the treatment. The reasonableness of the tort victims' action or inaction is the appropriate focus of the inquiry. "Discovery" does not require certain knowledge but merely sufficient information to incite curiosity as to the cause of the discomfort. Knippers v. Lambard, 620 So.2d 1368 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1169 (La.1993).
In Herold v. Martinez, 30,684 (La. App.6/24/98), 715 So.2d 660, 662, writ denied, 98-1932 (La.11/6/98), 727 So.2d 448, this court examined the inquiry into the reasonableness of plaintiffs' actions.
When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care provider to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the facts and the cause of action are reasonably knowable to plaintiff. Inaction by a plaintiff for more than one year under these circumstances is not reasonable. Harlan v. Roberts, 565 So.2d 482 (La.App. 2d Cir.1990).
When a party has sufficient information to incite curiosity, to excite attention or to put a reasonably minded person on guard and call for inquiry, he or she has the constructive knowledge necessary to start the running of prescription. As stated by this court in Harlan:

The law does not require that a patient be informed by an attorney he has a medical malpractice action before prescription will begin to run. Likewise, it is not a requirement that a patient be informed by a medical practitioner of possible malpractice before prescription will begin to toll. The court may take into consideration such factors as the patient's educational background, intelligence and past experience with medical procedures in assessing whether or not he had knowledge. (Citations omitted.)
While the court may consider the plaintiffs' educational background, intelligence and past experiences with medical procedures to determine if they had knowledge of a potential malpractice claim, plaintiffs may not escape the commencement of prescription by attempting to establish that their ability to comprehend and evaluate the facts is inferior to that of a reasonable man, absent some proof. The correct standard is whether a reasonable person would have or should have discovered facts sufficient to signal the alleged wrongdoing in the same circumstances. LeCompte v. State, DHHR, 97-1878 (La.App. 1st Cir.9/25/98), 723 So.2d 474. Rejecting the LeComptes' claim that they had minimal education and questionable competence, the court noted the mother had obtained a GED, entered beauty school and held a number of jobs since she was 16. The father in LeCompte did not finish high school but entered the army from which he was honorably discharged and maintained independent living in a number of states. The parents knew at birth that there were problems at the birth and that the child was premature and developed respiratory distress for which she was hospitalized. The LeComptes had claimed that their background and level of intelligence prevented them from inquiring about malpractice until the mother saw a lawyer's television ad stating that doctors sometimes caused cerebral palsy. While the plaintiffs here urged that the mother's very young age, inexperience and lack of education be considered, the record shows *716 that, like the parents in LeCompte, supra, she obtained a GED and other training and that the parents both lived and worked independently.
In Maung-U v. May, 556 So.2d 221 (La.App. 2d Cir.1990), writ denied, 559 So.2d 1385 (La.1990), the medical malpractice action brought on November 26, 1984 and arising out of the birth of a child on July 29, 1982, had prescribed. A nurse told the father the baby was almost here at 9:30 PM, but he did not see Dr. May enter the delivery room until 10:45 PM. The mother testified that the nurses in the delivery room were very nervous and she could tell something was wrong. The baby was born at 11:27 p.m. with the umbilical cord tightly wrapped three times around her neck. The child suffered asphyxia but was resuscitated and placed in intensive care where doctors told the parents the infant had suffered oxygen deprivation which could cause brain damage, but that it was too soon to tell the extent. The child was examined by numerous doctors who told the parents about developmental delays the child was experiencing. When the child was four months old, the family visited the father's sister, a neonatologist in California, who expressed anger over the delay in the child's delivery. The father also felt something was wrong from the night of delivery. In July 1984, the child was diagnosed with cerebral palsy. Although the parents argued that no one told them the child's condition was treatment related until they learned her condition was permanent and they consulted a lawyer, this court found that the parents were not reasonable in failing to bring the action for almost two years after the delivery when they knew all the facts and possible consequences almost immediately and they were in regular contact with the father's sister, an experienced neonatologist, about their child's condition and care. The parents' inaction was not reasonable.
The defendants rely upon Richardson v. Moffett, 608 So.2d 275 (La.App. 3rd Cir. 1992), writ denied, 612 So.2d 81 (La.1993), in which the parents were found to have been unreasonable in waiting 21 months after their son's birth to bring their malpractice action. The Richardsons contended that prescription did not begin to run until their child was diagnosed with cerebral palsy or until their attorney examined the medical records. On November 7, 1988, the mother went to the hospital in labor. Since the mother was only in the 27th week of gestation, the doctor attempted to inhibit labor with medication but was not successful. The doctor discussed with the parents the very critical nature of a premature delivery at 27 weeks and called in a neonatologist to discuss the problems premature infants faced. The doctor proceeded with the delivery and the child had many serious health problems and was later diagnosed with cerebral palsy.
In Griffin v. Kinberger, 507 So.2d 821 (La.1987), an 18-year-old mother with a sixth grade education gave birth in 1964 to a premature child who was treated with oxygen for several weeks. When the parents noticed the child had eye problems in 1965, the parents sought treatment from his pediatrician and an ophthalmologist, both of whom told the mother the blindness in one eye and problems in the other were a natural and expected consequence of the oxygen treatment at birth. In 1982, the mother read an article about a settlement in Florida of a claim for damages to the vision of a child negligently treated with oxygen at her premature birth. The court held that even if the malpractice victim is aware of an undesirable condition after medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize that the condition might be related to the treatment. This action was not prescribed because the court found that the first time the plaintiffs were reasonably alerted that they might have a cause of action was when the mother read the article.
In Poole v. Physicians & Surgeons Hosp., 516 So.2d 1185 (La.App. 2d Cir. 1987), writs denied, 519 So.2d 127, 128 *717 (La.1988), the malpractice claim had not prescribed even though the mother knew her infant was injured during a difficult delivery, required extended hospitalization and had developmental problems almost immediately. The doctor explained to the mother the delivery on May 20, 1983, had been complicated by her "v" shaped pelvis. The same doctor delivered her second child in November 1984, at which time she learned that every mother should have a fetal monitor which she did not have at her first delivery. Her second child was delivered by cesarian section after a pre-natal period similar to her first child; the mother then questioned why that procedure was not used with her first child. This court found that although the mother knew her child was injured at birth, she did not know her child's brain injuries might have been related to negligent medical services until her second child was born.
Although the parents of twins knew immediately that one of the infants suffered oxygen deprivation during birth which resulted in catastrophic brain injuries and a fractured skull, the action brought in November 1985 had not prescribed even though the delivery had occurred in November 1983. Welch v. St. Francis Medical Center, Inc., 521 So.2d 758 (La.App. 2d Cir.1988), writ denied, 524 So.2d 513 (La. 1988). Not until they consulted an attorney who obtained the medical records did they learn that only one fetal monitor was used and that the skull fracture was caused by a mid-forceps delivery. Doctors had advised the parents that twin births had higher risks, complications were not uncommon and that oxygen deprivation was a frequent complication in twin births. This court held that, although the parents knew of the child's serious problems, they understood from the doctors that the child's condition was the unfortunate but unpreventable outcome of a twin birth. Therefore, the parents were not unreasonable in not bringing the suit within one year of the birth.
Plaintiffs here were aware immediately or within days of Courtney's birth an undesirable condition developed at some point in time after medical treatment. The record in this matter clearly establishes that the plaintiffs knew Dr. Tugwell mistakenly estimated that the child would be only two to three weeks premature instead of seven weeks premature. They also learned during the child's hospitalization at the PICA at St. Francis[1] that Courtney had suffered oxygen deprivation due to her prematurity, had many very serious medical problems and was treated for infection and seizures. Absent the particular and unique circumstances in this case, we could have agreed with the trial court's decision that the parents had enough information to have caused reasonable persons to make further inquiry.
However, our review of this record leads us to conclude that the trial court erred in concluding that the plaintiffs were unreasonable in failing to recognize that the very bad outcome may have been related to medical treatment. The medical records from St. Francis which refer to the seizures as having "unknown cause" do not support the trial court's conclusion that the parents learned while the child was in PICU that she might have brain damage and cerebral palsy. Further, the mother's copious filings seeking social security benefits for Courtney clearly refer to her health problems caused by prematurity yet do not support the defendants' arguments that the filings establish the parents knew or should have known they were the victims of malpractice. More support for the parents reasonably not recognizing Courtney's unfortunate problems were due to *718 malpractice is the report from Dr. Quinones which stated when Courtney was 11 months old that they did not know the cause of her seizures.
Most important is Dr. Tugwell's own affidavit which stated a cesarian delivery was indicated to try and prevent infection because she had made no progress with the induction of labor and her membranes had been ruptured as long as they had. Based upon their consultations with Dr. Tugwell, the plaintiffs and other family members were entirely justified in concluding that an immediate delivery was unavoidable and necessary regardless of the gestational age of the fetus. Thus, when the family learned Dr. Tugwell had erred in his pre-delivery statement that the child would be only two to three weeks premature, they were reasonable in failing to suspect malpractice had harmed Courtney whose immediate delivery, they understood, was made necessary by the rupture of the amniotic sack. Further, even though the father was surprised by the gushing fluid in the delivery room and noted the doctor's surprised expression, the father had been informed by Dr. Tugwell that the delivery was appropriate and necessary at that time.
We consider this matter more analogous to LeCompte, supra in which prescription began with the diagnosis and information from the doctor. At age seven months the LeComptes' child was diagnosed with cerebral palsy and the mother was informed that cerebral palsy is usually caused by a lack of oxygen to the brain at birth. In filing the action one day before the child's third birthday, the court observed that all the facts alleged in the petition were known to plaintiffs the night of the birth. There were complications at birth, the child was hospitalized and later was diagnosed with cerebral palsy caused by oxygen deprivation at birth. The court held that prescription began to run with the diagnosis of cerebral palsy seven months after the child was born and the action had prescribed. Plaintiffs here knew that Courtney had suffered oxygen deprivation due to her prematurity, but did not have information to suspect that the prematurity itself might have resulted from malpractice.
When the mother gave birth to her second child in December 1994, circumstances arose that made her suspect for the first time that medical malpractice was involved in the birth of her first child. Prior to that time, the plaintiffs reasonably understood from the doctor that, because the mother's membranes had ruptured, the child had to be delivered to avoid infection. When her second child was born, the mother had reason to suspect that Courtney's condition could have been related to negligent acts during her delivery. See Poole, supra. Because these plaintiffs understood from the doctor that the premature birth was required to avoid infection and had no reason to suspect otherwise until the birth of their second child, we distinguish the present case from Maung-U, supra, and Richardson, supra, where the parents were unreasonable in failing to suspect malpractice and sue within one year of birth. Plaintiffs here supplied sufficient evidence to establish that they brought their action within one year of learning that Courtney's condition may have resulted from medical treatment. This action was brought within one year of the plaintiffs' having obtained information which suggested the possibility that Courtney's condition was related to malpractice and within three years from the date of the act. La. R.S. 9:5628.

DECREE
The judgment of the trial court which sustained the defendants' exception of prescription is reversed and this matter is remanded for further proceedings. Costs are assessed to the defendants.
REVERSED AND REMANDED.
NOTES
[1] At the hearing on the exception, both parents stated that they learned from St. Francis doctors that Courtney was seven weeks premature. Her deposition attached to one of plaintiffs' memos opposing the exception of prescription appears to support the trial court's statement in reasons for judgment that Dr. Tugwell informed the mother of this discrepancy. The source of her obtaining this information is not critical to this decision.